UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| JAMES HARDY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  CAUSE NO. 1:10-CV-372 |
| | ) |
| OFFICER RUNYON, OFFICER TUTTLE, | ) |
| OFFICER B LNU, SGT. CHRIS MAGDICH, | ) |
| and SHERIFF KENNETH C. FRIES, in his | ) |
| representative capacity, | ) |
| | ) |
| Defendants. | ) |

## OPINION AND ORDER

### I. INTRODUCTION

In this lawsuit brought under 42 U.S.C. § 1983, Plaintiff James Hardy contends that after he was committed to the Allen County Jail by the Allen Circuit Court on civil contempt for the failure to pay child support, he was wrongfully kept at the jail for an extra two days by jail confinement officers Joseph Runyon, Jacob Tuttle, Bret Frazier, and Christopher Magdich (collectively, "the jail officers"). Alleging that his over-detention amounted to punishment or a violation of due process, Hardy is suing the jail officers under the Eighth and Fourteenth Amendments of the United States Constitution.[1] Hardy is also suing Allen County Sheriff Kenneth C. Fries under Indiana tort law, alleging that because the jail officers wrongfully detained him, he is liable for their negligence or for false imprisonment under the doctrine of *respondeat superior.*

---

[1] Subject matter jurisdiction arises under 28 U.S.C. §§ 1331 and 1343. Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting. (Docket # 17.)

Now before the Court is a motion for summary judgment filed by Defendants, seeking judgment as a matter of law on all claims. (Docket # 33.) The jail officers maintain that they are entitled to summary judgment because they were not involved in the decision to detain Hardy and that other jail officials actually detained him over the weekend until his commitment order could be clarified by the court. Alternatively, the jail officers assert that they are entitled to qualified immunity since the phrasing of the order—which was markedly different from the Court's usual commitment order—was ambiguous and could have been interpreted to mean that Hardy needed to be kept longer.

As to the Sheriff, he argues that he cannot be held liable for the state law negligence claim because the jail officers being sued were not involved, and in any event, they breached no duty to Hardy or proximately caused him any damages. The Sheriff also asserts that Hardy cannot establish the requisite intent for a state law false imprisonment claim.

In response, Hardy maintains that the jail officers were personally involved in his extended detention and that his commitment order was clear and required his release two days before he was actually set free. Hardy essentially offers the same reasoning to support his negligence and false imprisonment claims against the Sheriff; that is, he contends the jail officers negligently interpreted a clear order that led to his extended and false imprisonment.

For the following reasons, the Court will GRANT summary judgment to the jail confinement officers on Hardy's § 1983 claims and will DISMISS his state law claims against the Sheriff without prejudice to their refiling in state court under 28 U.S.C. §

1367(c)(1) and (3).

## II. FACTUAL BACKGROUND

On October 8, 2009, Hardy was booked into the Allen County Jail based on an order issued by a Judge *pro tempore* of the Allen Circuit Court arising out of Hardy's dissolution case. (Keller Aff. ¶ 8, Ex. A.)  The brief order in whole stated:

> Petitioner by counsel Tracey Rosswurm. Respondent appears in person and by counsel Craig Patterson.  State of Indiana appears by DPA Trevino.  Respondent remains in contempt.  The Court now executes the previously entered commitment of thirty (30) days in the Allen County Jail with a $5,000.00 purge.

(Keller Aff. Ex A.)

The order was received by Officer Andrew Keller, one of the two booking officers at the jail. (Keller Aff. ¶¶ 2, 7.)  Keller entered Hardy's commitment information into the jail's computer records as "30 DAYS W/$5000 CASH PURGE" and calculated his release date as Saturday, November 7, 2009. (Keller Aff. ¶ 8, Ex. B.)  Keller understood the order to mean—since it was different from the usual contempt commitment order coming from either the Circuit or Superior Courts—that Hardy was to be held for thirty days and needed to pay $5,000 to purge himself of contempt before he could be released.[2] (Keller Aff. ¶¶ 9, 10.)

Keller and Officer Jodi Ellert are the two jail booking officers responsible for maintaining the jail's inmate records and commitment orders; as such, they are the primary communication link between the jail and the courts. (Keller Aff. ¶¶ 2-4; Ellert

---

[2] Generally, the customary commitment order would provide for confinement for a determinate period, but with the added proviso that the person could purge himself of contempt with the payment of a particular dollar amount. (Keller Aff. ¶ 11, Ex. C.)  The order then would typically specify that the person was to remain in custody until the earlier of either the purge payment or his next court date. (Keller Aff. ¶ 11, Ex. C.)

3

Aff. ¶¶ 2-4.) Consequently, when an individual is in the jail under a court order, a copy is provided to Keller and Ellert for entering information, such as the individual's release date, into "Spillman," the jail's internal computer records system. (Keller Aff. ¶ 5; Ellert Aff. ¶ 5.)

The computer record is then used to create a daily release report, listing each inmate who may be eligible for release that day. (Ellert Aff. ¶ 6.) Based on that report, an officer on duty is to pull the jail packet of each inmate whose name appears on the release report to determine if the inmate has any other hold orders or other sentences that would prevent his release. (Ellert Aff. ¶ 7.) If an issue arises regarding the interpretation of a court order, it is brought to the attention of shift command and, if necessary, to Keller or Ellert to contact the court for clarification. (Ellert Aff. ¶ 8.)

On Saturday, November 7, 2009, Sergeant Tina Keffaber was the jail's "A shift" supervisor and thus responsible for the jail's operation and preparation of the shift's documentation. (Keffaber Aff. ¶ 3, Ex. A.) In that role, Keffaber received what the jail calls a "passdown" from the prior shift, the C shift, informing her of any issues arising during that shift. (Keffaber Aff. ¶ 4.)

On that day, Keffaber received a passdown to review Hardy's commitment information and to contact Ellert to determine if Hardy could be released since he had not paid the $5,000. (Keffaber Aff. ¶ 5, Ex. A.) Keffaber contacted Ellert at home to obtain clarification about the commitment order; Ellert, because she was unfamiliar with Hardy's order and agreed that the order's language was unusual, recommended that Keffaber contact Keller, Hardy's original booking officer, to see if he could provide any further information. (Keffaber Aff. ¶¶ 6-7; Ellert Aff. ¶¶ 10-11.) Ellert and Keffaber

agreed that if Keller could not provide any further clarification or information, Hardy should be held until the order could be clarified on Monday morning when the Allen Circuit Court opened. (Keffaber Aff. ¶ 8; Ellert Aff. ¶ 12.)

Keller, however, was unable to add anything, and he agreed that Hardy should be held until he could obtain clarification from the court, which could not occur until Monday morning. (Keffaber Aff. ¶ 9; Keller Aff. ¶¶ 13, 14.) Keller then instructed Keffaber to place Hardy's jail packet in the jail's booking slot so that he or Ellert could contact the court when it opened on Monday morning. (Keffaber Aff. ¶ 9.) Keffaber then made an entry in the jail log and sent a passdown to the next shift, the B shift, explaining that she had contacted Ellert and Keller about Hardy and that he was to be held until his order could be clarified by the court on Monday, November 9, 2009. (Keffaber Aff. ¶ 10.) Neither Ellert, Keller, nor Keffaber contacted Hardy about his continued detention. (Keller Aff. ¶ 16; Ellert Aff. ¶ 16; Keffaber Aff. ¶ 10.)

On Sunday, November 8, 2009, Sergeant Christopher Magdich was working as B shift command. (Magdich Aff. ¶ 3, Ex. A.) Officer Bret Frazier, a civilian confinement officer, was also working that shift and assigned to Hardy's cell block. (Magdich Aff. ¶ 4.) Officer Joseph Runyon, another civilian confinement officer, was also on that shift but assigned to a separate cell block. (Magdich Aff. ¶ 5.)

At some point that day, Magdich received an inmate request form from Hardy.[3] (Magdich Aff. ¶ 6, Ex. B.) Hardy's form stated: "Please inform the date that is shown for me to be released. Two officers stated that it was 11-7-09 @ specifically 7:00 am. Thank

---

[3] Hardy's form had actually been received by Frazier, who signed it at the top and sent it on to shift command. (Magdich Aff. ¶ 7, Ex. B.).

5

you." (Magdich Aff. ¶ 8, Ex. B.)

Magdich then accessed the computer system to review Hardy's case and saw Keffaber's passdown from the day before. (Magdich Aff. ¶¶ 9, 10.) Keffaber's entry indicated that Hardy's release had already been discussed with Ellert and Keller, and that before he could be released, his commitment order needed clarification, which would occur on Monday. (Magdich Aff. ¶ 10, Ex. A.) Magdich then wrote a response to Hardy: "You must pay $5000 and serve 30 days." (Magdich Aff. ¶ 11, Ex. B.) Magdich had no further contact with Hardy. (Magdich Aff. ¶ 12.)

On Monday, November 9, 2009, Ellert contacted the court at approximately 8:00 a.m. and obtained clarification that Hardy could be released. (Ellert Aff. ¶ 14.) Hardy was then released from the jail at approximately 8:15 a.m. (Ellert Aff. ¶ 15.)

### III.  STANDARD OF REVIEW

Summary judgment may be granted only if there are no disputed genuine issues of material fact. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). When ruling on a motion for summary judgment, a court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Id.* The only task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). If the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmoving party, summary judgment may not be granted. *Payne*, 337 F.3d at 770. A court must construe the record in the light most favorable to the nonmoving party and avoid "the temptation to decide which party's version of the facts is more likely true[,]"

as "summary judgment cannot be used to resolve swearing contests between litigants." *Id.* However, "a party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id.* at 771.

## IV.  DISCUSSION

### A.  Hardy's § 1983 Claims

Although barely mentioned, Hardy apparently is advancing either a claim under the Eighth Amendment or, more likely, a claim under the Due Process clause of the Fourteenth Amendment. *Johnson v. Herman*, 132 F. Supp. 2d 1130, 1138-39 (N.D. Ind. 2001) (citing *Armstrong v. Squadrito*, 152 F.3d 564, 576-77 (7th Cir. 1998)).

The Eighth Amendment is inapplicable from the outset.  Hardy was in the jail for civil contempt for his presumably wilful failure to pay child support.  Indeed, the court must have determined that Hardy had the ability to pay, but refused to do so. *Marks v. Tolliver*, 839 N.E.2d 703, 707-08 (Ind. Ct. App. 2005) (citing *Branum v. State*, 829 N.E.2d 622, 623 (Ind. Ct. App. 2005)) (stating that incarceration is allowable only where the support order upon which release is conditioned is attainable).

As a consequence, and as it is sometimes put, Hardy held the keys to the jail in his pocket. *Gillis v. Litscher*, 468 F.3d 488, 494 (7th Cir. 2006).  In short, Hardy cannot engineer an Eighth Amendment violation by complaining that his detention is punishment when he could have been released from jail by paying the child support the court determined he had the ability to pay. *Rodriguez v. Briley*, 403 F.3d 952 (7th Cir. 2005); *see also Ingraham v. Wright*, 430 U.S. 651, 667-78 (1977) (recognizing that the Eighth Amendment has been held inapplicable to incarceration for civil contempt);

7

*United States v. Dien*, 598 F.2d 743, 745 (2d Cir. 1979) (stating that the Eighth Amendment does not apply to a civil contempt sentence).

Therefore, and primarily because Defendants do not challenge the notion, the Court assumes that Hardy's forty-eight hour detention beyond his alleged release date gives rise, as he claims, to a substantive due process claim. Consequently, Hardy must show that the action or inaction of the jail officers rose to a level that shocks the conscience. *Cnty. of Sacramento v. Lewis,* 523 U.S. 833, 848-49 (1998). In a jail setting, however, where there is some luxury of forethought, a showing of deliberate indifference is sufficient to support a substantive due process claim. *Armstrong*, 152 F.3d at 576 (quoting *Cnty. of Sacramento*, 523 U.S. at 848-49). Stated another way, when the circumstances permit public officials the opportunity for reasoned deliberation in their decisions, their conduct shocks the conscience when it evinces a deliberate indifference to the rights of the individual. *King v. East St. Louis Sch. Dist. 189*, 496 F.3d 812, 819 (7th Cir. 2007); *Armstrong,* 152 F.3d at 576; *Johnson*, 132 F. Supp. 2d at 1139.[4]

1. <u>Hardy Has Not Shown That the Jail Officers Extended His Detention or Were Deliberately Indifferent to His Continued Detention</u>

The jail officers argue that if anyone erred in keeping Hardy for too long, it was Keffaber, Ellert, and Keller, and this defeats Hardy's claim against them as a matter of law. (Reply Br. 4.) Placed in a legal context, the jailers essentially argue that they cannot

---

[4] The Eighth Amendment also applies a deliberate indifference standard. *See, e.g., Johnson v. Snyder*, 444 F.3d 579, 585 (7th Cir. 2006) (articulating that deliberate indifference requires a culpable state of mind such as ignoring a known risk of harm and, therefore, "is more than negligence and approaches intentional wrongdoing") (quotation marks and citation omitted); *Hart v. Sheahan*, 396 F.3d 887, 891 (7th Cir. 2005).

be held liable for detaining an inmate "if the errors upon which liability is asserted take place beyond the scope of [their] responsibility . . . ." *Armstrong*, 152 F.3d at 570 (quoting *Wood v. Woracheck*, 618 F.2d 1225, 1231 (7th Cir. 1980) (citing *Bryan v. Jones*, 530 F.2d 1210, 1215 (5th Cir. 1976)) (explaining that a jailer is not liable for an over-detention if "the errors take place outside of his realm of responsibility").

Hardy maintains, however, that the jailers are liable because they were all working on his cellblock on November 8, 2009. In addition, Hardy contends that he communicated his concerns to at least Frazier, one of the civilian confinement officers. He also emphasizes that Magdich must have been involved because, after noting Keffaber's passdown, Magdich responded to his inquiry with, "You must pay $5,000 and serve 30 days." (Magdich Aff. Ex. B.)

In *Armstrong*, 152 F.3d at 567, the plaintiff was held in custody for fifty-seven days on a body attachment without a court appearance. The warrant had issued after Armstrong failed to appear for a contempt hearing regarding his child support arrearage, and he voluntarily surrendered, expecting to be released in a matter of hours. Unfortunately, someone in the sheriff's office incorrectly transcribed Armstrong's warrant number on the form submitted to the court, and as a result, the court did not know Armstrong was in jail awaiting an appearance. *Id.* at 568. For nearly two months, Armstrong repeatedly asked guards and other officers when he could expect to appear in court, but was either ignored or told that his detention was not unusual. *Id.* Although the guards did check the jail's computer several times, Armstrong never appeared on the court's transport list due to the warrant transcription error. *Id.* When Armstrong attempted to prepare and submit written complaints, the guards refused to accept them,

telling him it was pointless since they were monitoring the computer. *Id.*

The district court granted summary judgment in favor of the individual confinement officers in *Armstrong* on the same basis (and citing the same case) the confinement officers rely upon here—that is, that Armstrong failed to establish that the guards "caused or participated in a constitutional deprivation." *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996). More to the point, the district court absolved the individual confinement officers of liability because they had taken no part in the transposition of Armstrong's case number, and thus were not personally involved in the error causing the protracted confinement. *Armstrong*, 152 F.3d at 580. The Seventh Circuit, however, reversed, because what Armstrong was really complaining about was not any involvement in the transposition of the number, but rather, the deliberate indifference of the jailers "in not passing his written complaints to their superiors and in keeping him locked up." *Id.*

Hardy's case is different, however, not only by degree, but by the argument he advances. For instance, unlike *Armstrong*, the jail officers here did not keep Hardy on a lengthy administrative merry-go-round. His circumstances do not come close to the situation in *Johnson*, 132 F. Supp. 2d at 1140-42, either, where despite repeated complaints, the jailers waited eighteen days to start investigating his possible over-detention.

Rather, after Hardy made his sole complaint, it was promptly submitted by either Tuttle or Frazier, both civilian confinement block officers, to Magdich, who was the shift commander. The record also indicates that Runyon (a civilian confinement block officer) was on another cell block at the time, and despite Hardy's speculation to the

10

contrary, was the one Defendant who was clearly not personally involved in the alleged constitutional deprivation. *Vance*, 97 F.3d at 991.

In any event, Magdich, who Hardy singles out in particular, promptly investigated Hardy's written inquiry. Magdich quickly learned through the jail's computer system and through Keffaber's passdown, that other jail officials (quite apart from Hardy's request) had already determined that his commitment needed clarification and that it would be brought to the court's attention on Monday. Thus, stated simply, Tuttle or Frazier immediately brought Hardy's question to their superior, Magdich, and he soon learned that he did not need to bring Hardy's situation to the attention of his superiors since they were already aware of it. And, of course, Hardy's situation was then quickly resolved within minutes of the court opening that Monday.

These facts quite tellingly highlight Hardy's failure to mention "deliberate indifference," except for one time in passing—a notable omission given that "extended incarceration must also be the product of deliberate indifference before a constitutional violation, as opposed to an error of state law, is implicated." *Campbell v. Peters*, 256 F.3d 695, 700 (7th Cir. 2001) (citing *Moore v. Tartler,* 986 F.2d 682, 686 (3d Cir. 1993); *Sample v. Diecks*, 885 F.2d 1099, 1108-09 (3d Cir. 1989); *Haygood v. Younger*, 769 F.2d 1350, 1354-55 (9th Cir. 1985)). In short, on this record there is nothing that conjures up even an inference that any of the jail officers were guilty of deliberate indifference to Hardy's continued detention. *Cf. Armstrong*, 152 F. 3d at 580; *Johnson,* 132 F. Supp. 2d at 1140-1141.

And of course, Hardy overlooks that, on this record, it was beyond the scope of the authority and responsibility of Tuttle, Runyon, and Frazier as civilian confinement

11

officers to release him. (Ellert Aff. ¶ 17; Magdich Aff. ¶ 14.) Thus, as a matter of law, they cannot be liable for Hardy's continued detention. *Wood,* 618 F.2d at 1231.

Accordingly, based on this record, Hardy's claim under § 1983 against the jail officers fails as a matter of law. Nevertheless, the Court will proceed to address the jail officers' alternative argument that they are entitled to summary judgment on the basis of qualified immunity.

2. <u>The Jail Officers Are Entitled to Qualified Immunity</u>

The jail officers' qualified immunity argument centers on the premise that Hardy's commitment order was either hopelessly confusing or clearly required Hardy's detention until he purged himself of contempt by paying $5,000. The jail officers argue that, in either event, it was reasonable to briefly detain Hardy until the order could be clarified on Monday morning. In effect, the jail officers maintain that a reasonable jail officer "'could have believed [Hardy's detention] to be lawful, in light of clearly established law and the information [they] possessed,'" and, accordingly, they are entitled to qualified immunity. *See, e.g., Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 475 (7th Cir. 2011) (citing *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).

In response, Hardy argues that the commitment order was "crystal clear" in that unless he paid $5,000, his release was to occur on the thirtieth day. He contends that no jail officer could reasonably read the order to mean that he must be held until the purge money was paid, as that effectively consigned him to a "debtor's prison." Thus, according to Hardy, when Magdich read to the order to mean that he must both pay $5,000 and serve thirty days, this led to continued detention and violated a clearly

established constitutional right. (Resp. Br. 6; Sur-Resp. 2.)

"[Q]ualified immunity protects government officials from liability for civil damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Gonzalez v. Vill. of W. Milwaukee*, -- F.3d --, 2012 WL 313572, at *6 (7th Cir. 2012) (quoting *McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010)). Claims of qualified immunity involve two inquiries: (1) whether the official violated a constitutional or statutory right, and (2) whether the right was clearly established at the time of the alleged misconduct. *Id.* (citing *Whitlock v. Brown*, 596 F.3d 406, 410 (7th Cir. 2010)). A negative answer to either question entitles the official to the defense. *Id.*; *Hanes v. Zurich*, 578 F.3d 491, 493 (7th Cir. 2009).

Although at a high level of generality an individual has a clearly established constitutional right not to be incarcerated beyond the term of his sentence, the qualified immunity inquiry is to be undertaken in the specific context of the case. *See Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (citing *Saucier v. Katz,* 533 U.S. 194, 201 (2001), *overruled on alternate grounds by Pearson v. Callahan*, 555 U.S. 223 (2009)); *Campbell v. Peters*, 256 F.3d 695, 700-01 (7th Cir. 2001) (holding that the court does not deal with generalities but must instead determine whether it was clearly established that the defendants, in revoking the good conduct credits and computing a new release date, violated the plaintiff's constitutional rights by requiring him to serve more time than state law and his sentence required).

Consequently, "[b]ecause the focus is on whether the officer had fair notice that [his] conduct was unlawful, reasonableness is judged against the backdrop of the law at

the time of the conduct." *Brosseau*, 543 U.S. at 198. Specifically, the Supreme Court has held that "[i]f the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation." *Id.* Thus the "dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 199 (quoting *Saucier*, 533 U.S. at 202); *Gonzalez*, 2012 WL 313572, at *9 (citing *Purtell v. Mason*, 527 F.3d 615, 621 (7th Cir. 2008)).

Hardy's argument seems pinned to the notion that no jail officer could have reasonably thought that his continued detention was lawful because no jailer would ever think that an Indiana state court judge would have committed him to jail for an indeterminate period and until he purged himself of contempt by paying $5,000. There are at least two flaws in this contention.

In the context of child support enforcement, the primary objective of civil contempt is not to punish but to coerce compliance, through imprisonment if necessary. *Brown v. Brown*, 187 N.E. 836, 837-38 (Ind. 1933); *Marks*, 839 N.E. 2d at 707. Nevertheless, the recalcitrant party must be given an opportunity to purge himself by paying the amount owed. *Brown*, 187 N.E. at 837-38. And incarceration is allowable only where the support order upon which release is conditioned is attainable. *Marks,* 839 N.E.2d at 707-08 (citing *Branum v. State*, 829 N.E. 2d 622, 623 (Ind. Ct. App. 2005)). Therefore, the commitment order implicitly found that Hardy had the attainable ability to pay the $5,000 child support arrearage, and thus a reasonable jailer could certainly conclude that he was in no danger of languishing in jail forever because

of an inability to pay.

And more importantly for our purposes here, a coercive order can specify that the defendant is to remain in custody unless and until he complies with the order for payment. *Brown*, 187 N. E. at 836. Only if the person can show that he does not have the actual ability to pay (something Hardy apparently did not contend) is he then entitled to discharge. *Id.* at 838. Otherwise, the defendant can be held indefinitely until he complies with the order. *Id.*; *see also Moore v. Ferguson*, 680 N.E.2d 862, 866 (Ind. Ct. App. 1997) (citing *Hays v. Hays*, 22 N.E.2d 971 (Ind. 1939)). Consequently, under Indiana law, Magdich and all the other jailers could have reasonably read the order to require Hardy's continued detention until he purged himself of contempt by paying $5,000, and therefore could have believed his continued detention to be lawful in light of clearly established law and the information they possessed. *Hernandez*, 657 F.3d at 475.

At most, the jailers committed a reasonable error in thinking that Hardy needed to be detained until his ambiguous commitment order was clarified, and thus they are entitled to qualified immunity as a matter of law. *Grayson v. Schuler*, 666 F.3d 450, 455 (7th Cir. 2012) (citing *Vinning-El v. Evans*, 657 F.3d 591, 594 (7th Cir. 2011)).

### B. Hardy's State Law Claims Against Sheriff Fries

Hardy's state law claims against Sheriff Fries basically rely on the same propositions he advances under § 1983—that his commitment order was clear, the jailers had a duty to release him which they breached when they kept him until Monday, and this constitutes negligence or false imprisonment for which the Sheriff is liable under the doctrine of *respondeat superior*.

Having granted the jail officers summary judgment on Hardy's federal claims, the only basis for continued jurisdiction over Hardy's state law claims is the supplemental jurisdiction statute, 28 U.S.C. § 1367, which allows federal courts to decide state law claims that are outside the federal diversity jurisdiction if they are so closely related to the plaintiff's federal law claims as to be in effect part of the same case. The immediate question therefore is whether the Court should exercise or relinquish that supplemental jurisdiction of the remaining state law claims and dismiss the balance of Hardy's suit without prejudice to his refiling them in state court.

The criteria for declining to exercise supplemental jurisdiction are set forth in § 1367(c):

> (c) The district courts may decline to exercise supplemental jurisdiction . . . if—
>
> (1) the claim raises a novel or complex issue of State law,
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

In this instance, dismissal is expressly authorized as Hardy's case fits within at least two, and perhaps the first three, subsections of § 1367(c).

For instance, the Court could not locate, and the parties do not cite to, any cases addressing claims of negligence under Indiana law that establish the contours of the duty of care an Indiana jailer, for instance, must exercise to effect a prisoner's release. Although it can be presumed that a jailer owes a duty to release a prisoner when his

sentence is up, DAN B. DOBBS, ET AL., THE LAW OF TORTS § 43, p. 112 (2nd ed. 2011), the question of when Hardy's "sentence" was truly up under these circumstances (*i.e*, perhaps, when it was ultimately "clarified") presents a novel or maybe even a complex, issue of state law. Similarly, Hardy's false imprisonment claim against the Sheriff may rise or fall on that determination. Clearly, under § 1367(c)(1), the Indiana state courts are better situated to address such issues. *Payday Today, Inc. v. Ind. Dept. of Fin. Insts.*, No. 2:05-cv-122 PS, 2006 WL 148943, at *11 (N.D. Ind. Jan. 17, 2006).

Moreover, with the granting of summary judgment in favor of the jail officers on Hardy's § 1983 claims, the state law claims not only predominate, they are all that remain for determination. Therefore, his case falls literally within § 1367(c)(3).

And finally, the Seventh Circuit has identified three situations where a court should retain jurisdiction over supplemental claims even though the federal claims have dropped out: where the statute of limitations would bar the refiling of the supplemental claims in state court; where substantial federal judicial resources have already been expended on the resolution of the supplemental claims; and where it is obvious how the claims should be decided. *Williams Elecs. Games, Inc. v. Garrity*, 479 F.3d 904, 906-07 (7th Cir. 2007) (citing *Wright v. Assoc. Ins. Cos.*, 29 F.3d 1244, 1251-52 (7th Cir. 1994)).

Here, the statute of limitations would not bar refiling in state court given the tolling provision located at § 1367(d). Furthermore, substantial federal judicial resources have not been expended on the resolution of the supplemental state law claims. Additionally, as mentioned previously, it is not obvious how Hardy's state law claims should be decided. Therefore, now that all of Hardy's claims over which the Court had original jurisdiction have dropped out, the Court declines to exercise

supplemental jurisdiction over his state law negligence and false imprisonment claims against Sheriff Fries and, accordingly, they will be dismissed.

## V.  CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' motion for summary judgment (Docket # 33) IN PART, and the Clerk is directed to enter judgment in favor of the jail confinement officers Joseph Runyon, Jacob Tuttle, Bret Frazier, and Christopher Magdich and against Hardy on his § 1983 claims.  The motion for summary judgment is otherwise DENIED, and Hardy's state law claims against Sheriff Kenneth C. Fries are DISMISSED without prejudice to refiling in state court.

Enter for February 23, 2012.

S/Roger B. Cosbey
Roger B. Cosbey
United States Magistrate Judge
